# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

| | | |
|---|---|---|
| In re: | } | |
| SAURABH VASUDEVA, | } } } | Case No. 09-42192-JJR-7 |
| Debtor. | } } | |

| | | |
|---|---|---|
| KEJRIWAL PAPER USA, LTD., | } } | |
| Plaintiff, | } } | |
| v. | } } | Adv. P. No. 09-40113-JJR |
| SAURABH VSUDEVA, | } } | |
| Defendant. | } } | |

## OPINION

In its complaint, the plaintiff alleged that a debt owing to it by the debtor/defendant was not dischargeable under Section 523(a) of the Bankruptcy Code.[1]  The debtor answered and denied the plaintiff's allegations, and this adversary proceeding was tried on October 21, 2010.  In compliance with Bankruptcy Rule 7052(a), the following shall constitute the Court's findings of fact and conclusions of law.

### Jurisdiction:

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the General Order of Reference, as amended, entered by the United States District Court for the Northern District of Alabama.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2);

---

[1]Unless otherwise indicated, references to the "Bankruptcy Code" or "Code" are to the Bankruptcy Code, 101 U.S.C. § 101, *et seq*, and references to a "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure.

therefore, the Court has authority to enter a final order.

Background and Facts:

Before discussing the facts that gave rise to the underlying claims in this adversary proceeding, the Court will jump ahead and quickly dispose of a defense often raised by individual defendants who are being pursued by creditors for obligations incurred by a business entity controlled by the defendants. In this case, the debtor, who was originally from India, did business through at least three affiliates: H.A.H. Logistics USA, Pvt. Ltd, Asian Persuasion, Inc. and R & A Metals, LLC. It appears theses affiliates were, respectively, a limited partnership, a corporation and a limited liability company. Although such entities generally shield their equity-owners from personal liability, the facts in this case clearly proved the debtor unabashedly operated these affiliates as his alter egos: when one would become financially distressed or was no longer a viable business entity, he would switch to another. The debtor made no serious attempt to shield himself from liability by hiding behind his affiliates. Thus, the debts owing by the debtor's affiliates to the plaintiff, at least for the purposes of this adversary proceeding, were treated by the Court as the personal obligations of the debtor.[2]

The debtor (acting through H.A.H. Logistics) and the plaintiff entered into a written contract dated May 17, 2007. (Debtor's Ex. 4).[3] The contract stated virtually none of the material terms of

---

[2] As discussed below in footnote 5, the plaintiff's nondischargeability claim has traction under Code section 523(a)(6) as a debt arising from an alleged willful and malicious conversion of the plaintiff's property. Even if the affiliates were not deemed alter egos of the debtor, he could not insulate himself from liability for an intentional tort he personally committed while acting as an agent of one of the affiliates.

[3] The hand-written date of "07-05-2007" appears in the upper right-hand corner of the first page of the contract. However, the actual date of the contract can be found on the second page next to the officer's signature for H.A.H. Logistics.

2

the parties' agreement and had little to do with the ultimate decision reached by the Court. Fortunately, those terms were not in dispute. Simply stated, the plaintiff exported from India to the United States several large containers of school paper products. The debtor's responsibilities were to guide the imported paper through U.S. customs, arrange ground transportation from the port of entry to Huntsville, Alabama, and upon arrival provide warehouse storage. The expenses incurred with respect to customs, ground transportation and storage were to be advanced by the debtor. And apparently these expenses were to be reimbursed to the debtor when the paper goods were sold. It was unclear exactly how the debtor was to profit from this transaction, but as events unfolded turning a profit was the least of the parties' problems.

Through no fault of the debtor, the paper goods did not arrive in time to be purchased by retailers for the 2007 school year. Thus, none was sold and there was no money to reimburse the debtor for his out-of-pocket expenses. The debtor initially requested and then begged the plaintiff to reimburse him for his expenses, but apparently his requests, and later begging were ignored. The expenses continued to mount-up and the debtor took matters in his own hands. Using a commissioned sales representative who sold products for the plaintiff, the debtor (acting through R & A Metals) sold between 10% to 15% of the paper for $176,210.56. The sale proceeds were approximately the same amount as the unreimbursed expenses that had been advanced by the debtor on behalf of the plaintiff.[4] The issue in this adversary proceeding is simply whether the debtor reasonably believed he had permission to make the sale and retain the proceeds to reimburse himself for the expenses he had advanced. The debtor was adamant that he had the plaintiff's permission,

---

[4]According to the debtor, payment of these expenses was paid by his three affiliates, apparently depending which affiliate had funds available at the time—more evidence that the affiliates were the debtor's alter egos, and perhaps alter egos of each other.

3

and the plaintiff's representative was just as adamant that no such permission was given.

Alleging that the sale was not authorized, and that the debtor had no right to retain the sale proceeds as a reimbursement, the plaintiff claimed the debtor's conduct was a willful and malicious injury (i.e. conversion) to the plaintiff's property. The plaintiff seeks a monetary judgment against the debtor in the amount of the sale proceeds, and a declaration that pursuant to Code § 523(a)(6) the judgment is not subject to discharge in the debtor's chapter 7 bankruptcy case.[5]

To a large extend, the plaintiff's claims either stand or fall on the Court's acceptance of the testimony given by the debtor at his pre-trial examination taken pursuant to Code §2004. During that examination the debtor testified that he did not own the paper and that he did not have an agreement with the plaintiff that allowed him to sell the paper. (Plaintiff's Exhibit 15). Nonetheless, at trial the debtor testified that he repeatedly complained to the plaintiff's representative, Pradip Shah, that he had not been reimbursed for expenses and pled for payment because of the financial burden he was under. Finally, according to the debtor, Shah relented and told the debtor to do whatever he wanted with the paper. The debtor interpreted Shah's response as permission to sell a portion of the paper as a means of obtaining funds necessary to reimburse his expenses. Shah adamantly denied giving the debtor permission to sell any of the goods.

As a general rule the Court would disregard trial testimony that conflicted with testimony

---

[5]The plaintiff's complaint also asserted the debt owing by the debtor was not subject to discharge under Code §§ 523(a)(2)(A)—false pretenses, false representations, or actual fraud—and § 523(a)(4)—fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. There was no evidence of fraud, so there can be no recovery under § 523(a)(2)(A). Likewise, there was no evidence to support a finding that the debtor was acting in a fiduciary capacity, and even if the debtor's conduct resembled an embezzlement or larceny, it could be more accurately labeled a willful and malicious conversion of the plaintiff's property. Thus, if the plaintiff is to prevail on its claim of nondischargeability, it must be grounded on § 523(a)(6).

4

given at a deposition or § 2004 examination, unless there was good reason for the conflict. In this instance there was a good reason. Remember the debtor was originally from India, and after listening to his testimony it is apparent he was reared there. Although the debtor speaks fluent English, the Court discovered there is a substantial difference between the dialect spoken by someone from India and the dialect commonly spoken in the United States; the two are virtually different languages. A statement made in an India-English dialect may be interpreted differently by someone speaking in an U.S.-English dialect. In spite of the Court's difficulty understanding the debtor's testimony, and that of the plaintiff's representative who also testified, the Court believes it was able to decipher the gist of what happened between the parties.

After carefully listening to the debtor, and observing his demeanor, the Court is convinced that the best interpretation of the debtor's testimony—after giving consideration to that given during the § 2004 examination and trial—is this: The original transaction as anticipated by the parties went awry. As previously mentioned, through no fault of the debtor, the paper goods did not arrive in the U.S. in time for back-to-school purchases by retailers. As a consequence the paper sat in the warehouse incurring additional storage fees that were being charged to the debtor, and for which he was entitled to reimbursement by the plaintiff. Not only was there no profit to be made, breaking even was no longer possible. There was also concern that the extended storage, in addition to running up more warehouse rent, might cause physical deterioration to the paper. And all this while the debtor was on the hook for the ever increasing expenses, and apparently was being ignored by the plaintiff.

The debtor admitted he did not have the plaintiff's permission under their written contract—their "agreement"—to sell the paper goods, but in response to the debtor's repeated pleas

5

for reimbursement, he believed he had received authority to take matters in his own hands—or at least given his desperate situation, that is how he interpreted his conversation with the plaintiff's representative. That interpretation, under these circumstances, was credible.

Conclusions of Law:

As previously noted, in order for the alleged debt to be nondischargeable, the plaintiff must prevail under Section 523(a)(6), which provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

Willful and malicious conversion falls within the parameters of willful and malicious injury. *Wolfson v. Equine Capital Corp. (In re Wolfson)*, 56 F.3d 52, 54 (11th Cir. 1995). The Bankruptcy Court for the Northern District of Alabama has examined what constitutes "willful and malicious" injury in the context of conversion:

> An individual debtor filing for relief under chapter 7 is not entitled to a discharge from any debt for willful and malicious injury by the debtor to the property of another. *See* 11 U.S.C. § 523(a)(6). Under § 523(a)(6), the injury must be both "willful and malicious." . . . "Willful" means deliberate or intentional. "Willful" modifies "injury." To be nondischargeable, the debtor must intend to injure the defendant or his property. Willful does not encompass a recklessly or negligently inflicted injury. "Malicious" means "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." "Willful and malicious injury includes willful and malicious conversion, which is the unauthorized exercise of ownership over goods belonging to another to the exclusion of the owner's rights." But not every tort of conversion falls within the purview of 11 U.S.C. § 523(a)(6). "[I]nnocent or technical" conversion of a person's property does not lend itself to a finding of a willful and malicious injury for dischargeability purposes. To be nondischargeable, the resulting injury must have been deliberate and intentional. A negligent or reckless conversion would not fall within the statute. Deliberate and intentional injury "does not follow as of course from every act of conversion, without reference to the circumstances."

*United General Title Insurance Co. v. Jordan (In re Jordan)*, AP No. 07-08052, 2008 WL 1746737, at * 3 (Bankr. M.D. Ala. Apr. 11, 2008) (citations omitted). This Court is of the opinion that the debtor's acts of selling the paper and using the proceeds to recoup his expenses did not rise to the level of a willful and malicious injury.

In *Dahlgren & Company, Inc. v. Lacina (In re Lacina)*, 162 B.R. 267 (Bankr. D.N.D. 1993), the bankruptcy court determined that the defendant's actions resulted in a willful and malicious conversion falling within the purview of § 523(a)(6). In *Lacina*, the defendant was party to a dealer arrangement with Dahlgren, wherein the defendant, or the "dealer," would be supplied early in the growing season with seed. Per the arrangement the dealer would house the seed and sell it to his own customers, collect payment, and remit the payment to Dahlgren.[6] By June 1st of each year the dealer had to remit the customer payments in full and return any unsold, undamaged seed for credit. By July 1st of each year Dahlgren would make a final settlement of the dealer's account and either pay the dealer a commission or require the dealer to bring the account current in the event of a negative balance. The dealer operated in accordance with the agreement for several years; however, when his side business began to fail and he needed additional funds to pay the operating expenses of the side business, the dealer began converting the checks into cash by forging Dahlgren's name. The dealer would not remit the proceeds to Dahlgren, but instead kept the proceeds to cover his own shortfalls. Dahlgren became aware of the dealer's actions and, after the dealer filed for bankruptcy protection, Dahlgren filed an adversary proceeding under § 523(a)(6) to have the debt declared nondischargeable. The bankruptcy court found by a preponderance of the evidence that the dealer

---

[6] Consistent with the dealer sales manual, the defendant's customers would make checks payable to Dahlgren.

7

had willfully and maliciously converted the funds for his own personal use. In making this determination, the court noted that in order to be excepted from discharge an act must have been deliberate or intentional, not "founded on a mere technical conversion which is precipitated by a misunderstanding or mistake without a conscious intent to violate the rights of another . . . ." *Id.* at 274. The longtime dealer, who was familiar with the required procedure under the dealer agreement and had abided by such terms for a number of years, "could not legitimately aver that he was operating under a mistaken belief as to the propriety of his conduct at the time he was forging the instruments." *Id.* at 275. In forging Dahlgren's name on the checks and keeping the proceeds for his own personal use, the dealer acted in a manner sufficiently "willful" for purposes of § 523(a)(6). Similar to the definition given to the term "malicious" by the Eleventh Circuit, the court recognized that Eighth Circuit precedent considered an act to be malicious if it had been undertaken "without just cause or excuse, and with the intent to injure" or with a "knowing wrongfulness or knowing disregard of the rights of another." *Id.* The court determined that the dealer acted with malice, as established "by overwhelming proof that the [dealer] acted with the knowledge that the creditor's economic interests would be, or could reasonably be expected to be, harmed through the unauthorized exercise of dominion over the checks and corresponding proceeds." *Id.* (citations omitted).

In the case *sub judice*, the debtor's actions in some ways correspond with those of the dealer in *Lacina*. Both men held property owned by another, and both used proceeds from the property to cover shortfalls in their personal financial situations. However, unlike the dealer in *Lucina*, the debtor's financial shortcomings related directly to the failure of the property owner - the plaintiff - to fulfill its own obligations to the debtor. Further, the debtor's sale of the paper and use of the

8

Case 09-40113-JJR    Doc 59    Filed 11/23/10    Entered 11/23/10 16:05:03    Desc Main
Document      Page 8 of 9

resulting proceeds to recoup his expenses was a technical conversion, done with the mistaken belief that he had authority to sell the paper for that purpose. The debtor did not intend to cause injury to the plaintiff but to simply obtain the funds that the plaintiff in turn owed to him but refused to pay; in other words, how could the plaintiff have been injured if the debtor used funds that the plaintiff already had the obligation to remit to him? There can be little doubt that the debtor was looking for any angle that would allow him to legitimately gain access to some money that would at least cover his out of pocket costs associated the transaction. When he did receive what he construed as authorization, he seized the opportunity and sold no more than what was needed for reimbursement; apparently he could have sold more, perhaps all the paper, but he limited the sale to only cover what he was owed. He used the plaintiff's sale agent; thus he was not trying to hide the sale from the plaintiff. Everything the debtor did, and perhaps more importantly what he did not do, pointed to his belief that he had at least a colorable right to make the sale. Thus, the Court concludes that the debtor's conduct was not malicious, a necessary ingredient for a creditor to be successful under Code section 523(a)(6).

Pursuant to Bankruptcy Rule 9021, a separate order shall be entered consistent with this Opinion.

Dated: November 23, 2010

/s/ James J. Robinson
JAMES J. ROBINSON
United States Bankruptcy Judge